**George H. Robinson et al., Appellees, v. Riverside Plaza Corporation, Appellant.**

**Gen. No. 32,240.**

Opinion filed March 29, 1928.

CLOYES & KLINGLER, for appellant.

BURRY, JOHNSTONE & PETERS, for appellees.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal by the defendant, the Riverside Plaza Corporation, from a judgment in the superior court, upon a trial by the court, with a jury, in favor of the plaintiffs, George H. Robinson, J. Stanley Brown, Howard E. Mitchell and James H. McGean, copartners, doing business as Robinson & Company, in the sum of $8,000.

(1) The declaration consists of the common counts and an amended bill of particulars. It was alleged

that the plaintiff, in the year 1924, was engaged in the investment banking business; that in July of that year, the defendant borrowed the sum of $800,000 from the Mutual Life Insurance Company of New York (hereinafter called the "Mutual Life"), and executed and delivered a trust deed upon certain real estate in Chicago to secure the payment of that sum; that it was provided in the trust deed that all special assessments assessed against the real estate should be paid when due by the defendant, and upon failure to make any such payment, the Mutual Life had the right to declare the debt due and payable at once and to foreclose the trust deed;

That on or about April 23, 1925, payments of special assessments against the real estate exceeding the sum of $200,000 became due and payable, and were not paid by the defendant when they became due; that thereupon the Mutual Life put the trust deed in the hands of its attorneys, with directions to commence foreclosure proceedings against the defendant;

That on or about April 24, 1925, the defendant, at that time being in the midst of negotiations for the complete financing of a large building which it intended to erect on the real estate in question, caused a telegram to be sent by C. W. Ruth of Chicago, who was acting as agent for the defendant, to Howard E. Mitchell, one of the partners of the plaintiff's firm in New York, requesting the plaintiff to obtain from the Mutual Life forbearance and withholding of foreclosure proceedings against the defendant until the payments could be met; that thereupon the plaintiff, acting upon that request, obtained from the Mutual Life an extension of time until May 12, 1925, in which to make payment;

That on or about May 11, 1925, the defendant, being still unable to make payment, caused a telegram to be sent to the plaintiff, by C. W. Ruth, defendant's agent, requesting the plaintiff to obtain a further forbearance

from the Mutual Life; that the plaintiff did secure further forbearance from the Mutual Life, as requested by the defendant, and from time to time obtained from the Mutual Life further forbearance and delay in instituting foreclosure proceedings; that in the course of the time that the plaintiff was obtaining forbearance and extensions of time, the plaintiff received other requests by letter and orally from Ruth, as agent for the defendant, to obtain extensions and forbearance;

That on or about May 25, 1925, Howard E. Mitchell, acting upon the request contained in the telegram received from Ruth as agent for the defendant, came to Chicago from New York, for the purpose of discussing matters with the agents and officers of the defendant, and remained in Chicago for two days, during which time he was engaged in such discussion and in obtaining information concerning the entire matter;

That the plaintiff obtained from the Mutual Life forbearance until about June 10, 1925; that on or about that date G. V. Dickinson, president of the defendant corporation, in the course of a long distance telephone conversation with Mitchell, requested the plaintiff to obtain a further forbearance and extension of time for making said payments until June 15, 1925, which extension the plaintiff secured;

That on or about June 16, 1925, Dickinson, by a telegram to Mitchell, requested the plaintiff to secure further forbearance and a further extension of time to July 10, 1925, and the plaintiff procured such extension from the Mutual Life;

That the defendant was unable to make the payments on the last-mentioned date, and the plaintiff, at the defendant's request, procured further forbearance and further extension of time from the Mutual Life from time to time thereafter until the payments were made on or about August 10, 1925;

That many other communications passed between the plaintiff and the defendant during the period between April 23, 1925, and August 10, 1925, and repeated conferences were held between the plaintiff and the officers of the Mutual Life, and much time and labor were expended by the plaintiff in and about the procuring of the forbearance and the numerous extensions above set forth.

Plaintiff's claim is for the fair and reasonable value of the services rendered by it to the defendant in obtaining from the Mutual Life forbearances and extensions of time, as above set forth, by reason of which services the defendant was enabled successfully to complete the refunding of the loan and the financing of its building project.

The bill of particulars puts the *ad damnum* at $50,250, and alleges that the plaintiff claims interest at five per cent per annum on that amount, from August 14, 1925, when the bill was rendered by the plaintiff to the defendant, and a demand for payment made.

On May 5, 1926, the defendant filed a plea of the general issue and an affidavit of merits. The affidavit of merits sets up that the plaintiff did not, at the defendant's request, or at the request of any authorized agent of the defendant, on the 14th day of August, or at any other time, perform any labor or services for the defendant; that the defendant did not, itself, or by any of its officers or agents, at the time alleged in the declaration, or at any other time, "request or employ the plaintiffs to perform any services whatsoever, except as brokers to secure the $800,000.00 loan mentioned in the plaintiffs' amended bill of particulars, for which services and all things done in connection therewith by the plaintiffs, the plaintiffs were paid in full the sum of $25,000.00 by the defendant."

(2) The record is voluminous. At the trial, testimony and exhibits were offered in evidence, covering in the record over 900 pages. Eight witnesses were

called on behalf of the plaintiff; ten witnesses on behalf
of the defendant, and, in addition, two depositions were
offered in evidence. The plaintiff introduced in evi-
dence 69 exhibits, and the defendant, 28 exhibits.

The ultimate question in the case is whether services
were rendered by the plaintiff for which the defendant
is liable.

(3) Some time early in 1924, the C. W. Ruth En-
gineering Company, a corporation (hereinafter called
the Ruth Company), which owned patents pertaining
to a certain type of garage and equipment for handling
automobiles for storage, had preliminary plans drawn
looking towards the erection of a combination office
and garage building on certain lots located at the
southwest corner of South Water street and Wabash
avenue, Chicago. At that time, one Clemons was vice
president, and one Stannard, treasurer, of the Ruth
Company. The Interstate Garage Corporation, with
others, owned the land in question. Early in 1924,
Clemons began negotiations with J. Milton Trainer and
Callistus S. Ennis, real estate brokers. In the course
of the negotiations, Trainer and Ennis suggested
changing the plans for those of a somewhat different
kind of building. Arrangements having been made on
that score, a contract was entered into about March 1,
1924, between Ennis and Trainer on the one hand, and
Clemons, as trustee for the stockholders of the Inter-
state Garage Corporation and some others, on the
other. Following that, in June, 1924, the defendant,
the Riverside Plaza Corporation, was organized, and
to it, Clemons, as trustee, and others, conveyed the
real estate in question. When the defendant company
was organized, Clemons became president, Stannard,
treasurer, and Trainer, Ennis and Dickinson, directors.
Until the defendant established an office with Ennis in
the Rector Building, in the fall of 1924, the mail for
the defendant, according to the testimony of Ruth,
came to the offices of the Ruth Company. Cloyes &

Klingler were attorneys for the Ruth Company, and also for the defendant. About the time the defendant was incorporated, or shortly thereafter; a contract was made with the Ruth Company to purchase its equipment, and for it to do the engineering work in connection with the garage part of the building. The exact amount of money that was put in originally is not shown, although there is evidence that on March 9, 1925, the Ruth Company put in $5,536.42, and on February 19, 1925, $10,250.00; that Stannard advanced $10,000, and that Ennis, Trainer and others put up a few thousand dollars in July, 1925. The record does not show in any way what the capital set-up of the defendant at that time was.

The plans for the construction of the building that was to be built were prepared by Giaver & Dinkelberg, and by the Ruth Company for garage equipment and design.

Shortly after the organization of the defendant, in the summer of 1924, the plaintiff, Robinson & Company, in behalf of the defendant, applied to the Mutual Life for a temporary loan of $1,000,000, on the property in question. Mitchell, one of the partners of the plaintiff, knew Peabody of the Mutual Life very well, and, also, was acquainted with Timpson, its vice president, and Shields, who was manager of its real estate department. Prior to that time, Mitchell had done considerable business with the Mutual Life. The Mutual Life offered to loan $800,000 for one year at six per cent, and the offer was accepted.

The loan was payable September 1, 1925, and was secured by a trust deed dated August 27, 1924, which was filed for record on September 10, 1924, on the above-mentioned property of the defendant, which property was at that time vacant and unimproved.

Mitchell testified that the $800,000 was not exactly a closed transaction in October, 1924; that he ''had to assure the Mutual Life that the special assessments

would be paid, otherwise the loan would not have been made''; that he ''was put under an obligation by the Mutual Life. They would not make the loan unless they had the assurances. They asked me whether I would give them those assurances. I said no, 'I do not know the Riverside Plaza people.' Then they said, 'We won't make the loan.' Well, I said, 'Would you be satisfied with the assurances of Mr. Eversz?' They said, 'We don't know Mr. Eversz.' Then I told them I had known Mr. Eversz over thirty years; that I had confidence in his statements. Knowing the Mutual Life as I did, and they having confidence in me, they said they would accept Mr. Eversz' statement''; that when they accepted Eversz' statement on his recom-mendation, the matter was closed, as far as the payment of the money was concerned, but ''so far as those assurances on special assessments, it was not closed''; that the Mutual Life required ''reasonable assurances.''

An opinion of title of the Chicago Title & Trust Company, which was obtained, showed certain special assessments, in excess of $200,000, were pending against the property. Considerable correspondence then took place between the defendant and Mitchell, the Chicago Title & Trust Company and the defendant, and Mitchell and the Mutual Life, in regard to the special assessments. On September 19, 1924, a supplemental opinion of the Chicago Title & Trust Company was furnished to the defendant that ''neither of these assessments are collectible or payable at this time; that the first will be placed in collection in 1925, and the second will probably be placed in collection at the same time, but may be deferred for another year.''

On September 26, 1924, Clemons telegraphed the plaintiff, suggesting that the contemplated improvements would increase the value of the land, and thus be sufficient security for the loan, in any event. The loan was then made, as stated above.

The trust deed provided, in a typewritten rider, substantially, that if all assessments levied against the property were not paid within 90 days after they became due and payable, the Mutual Life had the option of declaring the entire principal due.

Later, the defendant placed a second loan upon its property to secure an issue of notes aggregating $250,000, $25,000 of which notes were taken and accepted by the plaintiff and Eversz & Company as commissions for negotiating the $800,000 loan.

In the course of the trial, objecting to the introduction of a letter dated September 25, 1924, by the plaintiff to the defendant, counsel for the defendant said that the issue in the case was whether the plaintiff received employment from the defendant in 1925; that "there is no question * * * but what he (meaning Mitchell) was representing his company (meaning the defendant) at the time these transactions were had. There is no question about that, and we (meaning the defendant) paid them for it; we paid them $25,000.00; now they are urging these things and laying the foundation for the purpose of creating the impression in the jury's mind that they were employed in 1925."

On October 30, 1924, shortly after the closing up of the two temporary loans of $800,000 and $250,000, the defendant made a written proposition to the plaintiff and Eversz & Company authorizing them to procure a $6,000,000 first mortgage loan for the purpose of paying off the temporary loans and the completion of the proposed building on the property in question, and promising to pay them 5 per cent of that amount for their services. The proposition contained a great number of provisions in regard to the details of the financing of the matter. On October 31, 1924, the proposition was accepted and signed by the plaintiff and Eversz & Company. That contract, however, was canceled about January 1, 1925.

Following that, negotiations were begun on behalf of the defendant by Clemons, its president, with the Federal Securities Company, a Chicago banking house, for the financing of the whole project, which would involve approximately $8,000,000 to $10,000,000 of bonds and preferred stock of the defendant company. On January 13, 1925, a finance committee of the defendant was created, consisting of Dickinson, Trainer and Ennis. To that committee the defendant intrusted all negotiations for the new financing. In the latter part of May, 1925, Dickinson was elected president of the defendant company, instead of Clemons.

There is some testimony by Mitchell that Eversz & Company and the plaintiff, Robinson & Company were entitled to a participation in the profits that the Federal Securities Company would make out of the major financing. Mitchell testified that Eversz (some time before his death on May 24, 1925) told him that he had made some arrangements with Wilder, the secretary of the Federal Securities Company, to be compensated by that company; that Eversz told him, Mitchell, that he did not believe it would be possible for him to get a contract out of the defendant, but as Wilder was an old and intimate friend of his, he could get it from him. In a letter to the Federal Securities Company, dated June 3, 1925, Mitchell wrote that Eversz told him that he had taken up negotiations with the Federal Securities Company in regard to the division of prospective profits, and that he expected a 50-50 divide.

(4) Early in 1925, the Mutual Life took up the matter of the payment of the special assessments with its Chicago counsel, Winston, Strawn & Shaw. That involved the rights of the Mutual Life under the trust deed given by the defendant, in case the special assessments against the real estate were not paid, in compliance with the provisions of the trust deed. It was advised by counsel that the special assessments had

become due January 22, 1925, and that the 90-day limitation expired on April 22, 1925. It was also advised that if the payments were not made by April 23, the Mutual Life, in accordance with the trust deed, could declare the loan to be due and payable.

The special assessments were not paid on April 23, 1925, but at that time the defendant was conducting its negotiations with the Federal Securities Company in order to finance not only the payment of the temporary loans and the special assessments, but also the erection of the building that was planned.

There is considerable testimony and correspondence pertaining to negotiations which covered about three months, concerning the payment of the special assessments and the putting off of foreclosure proceedings by the Mutual Life. It shows anxiety on the part of the Mutual Life and threats on the part of the Mutual Life to foreclose, and anxiety on the part of the defendant to postpone foreclosure, and for time to close up its major financing, so as to be able by doing so to pay off what was due the Mutual Life and go on with its general building project.

(5) It is for the reasonable value of the services alleged to have been rendered by the plaintiff through Mitchell in causing the Mutual Life to forego foreclosure, to forbear and delay its threatened action, that this suit was brought.

On April 24, 1925, a telegram was sent by the Ruth Company to Mitchell, in care of Robinson & Company, stating that the Mutual Life was undertaking to "force action on delay of paying special assessment"; that the defendant was in the process of closing complete financing of the building with the Federal Securities Company, and that there was nothing to be alarmed about as to the assessment, and asking Mitchell to inform the Mutual Life that any undue pressure at that time might cause the defendant embarrassment.

Ruth testified that on the date of that telegram, Mitchell called him on the telephone, having tried to get Clemons, the president, and asked something about the special assessments, and that he, Ruth, answered with that telegram; that before sending the telegram, he asked and got the advice of Klingler, one of the attorneys for the defendant, who was, also, at that time counsel for the Ruth Company. Mitchell testified that upon receipt of that telegram he immediately took it to the Mutual Life and showed it to Shields, its real estate manager, and told him that he would consider it a personal favor if he would defer foreclosure proceedings for a sufficient length of time to permit the financing to go through; that Shields told him that if he had reasonable assurance that he would be paid within a reasonable time that he would grant a short extension; that he then called up Ruth on the telephone and told him that action would be deferred provided the Mutual Life had reasonable assurance that it would be paid on the day set for payment; that the day following, he wrote Ruth telling him what he had done, and of his negotiations with Shields. In a letter he stated that Shields said that the matter was automatically in the hands of the legal department; that foreclosure proceedings should be instituted immediately, if their invariable rule was adhered to; that he read Ruth's telegram to Shields and told him about the negotiations with the Federal Securities Company, and that foreclosure proceedings might at that time seriously embarrass the negotiations; that he would consider it a personal favor if he would instruct the legal department to hold off for a sufficient time to permit the negotiations with the Federal Securities Corporation to crystallize into actual contract.

It is claimed for the defendant that nothing that Ruth did was binding on it; that although he may have written many letters and taken part in certain negotiations with Mitchell and others, in an effort to get the

Mutual Life to put off foreclosure proceedings, from time to time, he did so entirely independent of the defendant, and that what Mitchell did, through Ruth or by himself, was never sanctioned, or ratified by it in any way. There are many circumstances shown by the evidence, however, which have to be taken into consideration in ultimately determining whether or not what was done in the matter was authorized, sanctioned or ratified by the defendant.

There is no doubt but that, after the various delays of foreclosure had been obtained, running from April 24 to June 16, Mitchell's authority to act for the defendant in regard to delay was completely and unqualifiedly sanctioned by the defendant, for on that date Dickinson, president of the defendant, wired Mitchell, "Authorize you on behalf of the Riverside to arrange extensions to July tenth," and, further, pursuant to Dickinson's communication, Mitchell took the matter up with Shields, manager of the real estate department of the Mutual Life, and obtained the extension to July 10, and wired the result to Dickinson. That correspondence between Mitchell and Dickinson, together with a letter of June 10, 1925, which Mitchell sent to Dickinson, and a telephone conversation which Mitchell testified he had with Dickinson on June 10, demonstrate conclusively that the defendant directly authorized some of the services of the plaintiff in delaying foreclosure.

And, further, considering not only that evidence, but all the evidence as to what was done, both by Ruth and Mitchell, from April 24, which is too voluminous to be recited here, we do not feel justified in overriding the verdict of the jury and holding that the defendant did not, by its conduct, ultimately recognize and sanction all the work of Mitchell as having been done for its benefit. From that, it follows that all that was done by Mitchell, on the subject of forbearance, constituted services for which the defendant impliedly owed the

plaintiff reasonable compensation. *Linn v. Linderoth,* 40 Ill. App. 320. In that case the court said:

"Where there is no relationship between the parties and one performs any service for another, the presumption is that it is to be paid for and the burden will be on the one receiving the service to show that it was agreed to be performed without remuneration. Bishop on Contracts, Sec. 217."

(6) It is urged that Mitchell expected to be compensated indirectly for his services in obtaining forbearance from the Mutual Life by participating with the Federal Securities Company in profits arising from the major financing; that Mitchell's services were rendered because of some ulterior personal interest, but all the evidence was submitted to the jury, and they were instructed, at the request of the defendant that if they found "from all the evidence that the plaintiffs had a personal interest in procuring forbearance by the Mutual Life Insurance Company from foreclosing its mortgage or deed of trust for failure of the defendant to pay certain special assessments, and procured said forbearance, then in the absence of an agreement either express or implied by the defendant to pay the plaintiffs for their services in procuring such forbearance the plaintiffs cannot recover of the defendant even though said services were beneficial to the defendant," and they brought in a verdict for the plaintiff. What evidence there was on that subject was not enough, we think, to justify us in overriding their verdict.

(7) It is argued, also, that Mitchell was under some obligation to aid the defendant in obtaining delay by reason of having given assurances to the Mutual Life that the defendant would meet its obligations, but there is no evidence that there was any binding obligation whatever upon him to help the defendant to get its contractual obligations stayed. As to the second mortgage notes in the sum of $15,000, which were accepted

by the plaintiff, in payment of the original commission, we do not think that affected in any way, or bore any relation to, the plaintiff's services in obtaining forbearances by the Mutual Life. Taken, all in all, the evidence tends strongly to show that the services of Mitchell were rendered with the view solely to accomplish the forbearance which the defendant, quite obviously, desired, and that those services were all ultimately sanctioned, ratified and adopted by the action of the defendant.

(8) Objection is made on the part of counsel for the defendant to instruction numbered 5. The part of the instruction which is involved is as follows: "Although you believe from the evidence that Ruth was not authorized by the defendant to engage plaintiffs' services for the defendant in securing forbearance from the Mutual Life Insurance Company and delaying foreclosure, if you believe from the evidence that the defendant through Dickinson, its president, knowing that the plaintiffs had been rendering such services for and on behalf of defendant afterwards requested the plaintiffs to obtain further extensions, the result and effect are the same as if Ruth had in the first instance been authorized by the defendant to request plaintiffs to render those services."

And it is urged against the instruction that there is no evidence in the record that Dickinson, or any other officer of the defendant, ever requested the plaintiff to obtain any extensions or forbearances whatsoever, but the answer to that is, that the record does show that after several extensions had been obtained and the payments not made, Mitchell, in contemplation of an endeavor to get a third extension, telegraphed, telephoned, and also wrote to Dickinson that to get another extension he, Mitchell, must have, to show Shields, a statement over the signature of an officer of the company, giving a definite date when the specials would be paid and that Dickinson thereupon wired

Mitchell the exact date on which the defendant would be able to pay the specials, signing the telegram with his full title as president, and confirming it by letter. There is, also, other evidence, such as the telegrams of June 16 from Dickinson to Mitchell.

Further, it is contended, in objecting to the instruction, that when Dickinson knew that the plaintiff had been rendering services on behalf of the defendant in the matter of forbearance, and requested Mitchell to obtain a further extension, that that did not, necessarily, ratify the original employment or the earlier services of the plaintiff. We cannot agree with that criticism. When Dickinson learned, through Ruth and Mitchell, or either of them, that Mitchell had been rendering services at Ruth's request (and there was evidence to that effect), and he went on in the way of continuing Mitchell's services, and accepting the benefit of them, the law would not permit the defendant to repudiate liability for any part of Mitchell's services. If Dickinson, being familiar with all the facts embraced within the instruction, asked Mitchell to continue his efforts (and there was evidence that he did) to obtain forbearance to a later date, that must be looked upon as an acquiescence in the employment of Mitchell whether by Ruth or the defendant and a ratification of that employment. The services of Mitchell were continuous, and liability on the part of the defendant for part of those services cannot reasonably be segregated from liability for the rest of the services.

Objections are made to another instruction, but, in our judgment, they are not tenable.

(9) It is contended for the defendant that the trial judge erred in ruling upon a certain hypothetical question as to the value of services. The question appeared in a deposition of one Huntley. Although counsel for the defendant objected to the hypothetical question when the deposition was taken, no motion was made prior to the trial to suppress the deposition, so

that the particular error referred to is not, in our judgment, now open for consideration. *Catlin v. Traders Ins. Co.*, 83 Ill. App. 40; *Benedict v. Dakin*, 243 Ill. 384; *Illinois Cent. R. Co. v. Foulks*, 191 Ill. 57.

(10) Some criticism is made of the proof as to the nature and value of the services rendered on behalf of the plaintiff. Considering the nature of the services rendered, we think there is ample evidence in the record justifying the amount of the verdict.

For the reasons stated, the judgment will be affirmed.

*Affirmed.*

HOLDOM and WILSON, JJ., concur.